UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| O.W.,<br>Plaintiff,<br>v.<br>FRANK BISIGNANO,<br>Defendant. | Case No. 25-cv-04364-VKD<br>**ORDER RE SOCIAL SECURITY APPEAL**<br>Re: Dkt. Nos. 13, 18, 23 |

Plaintiff O.W.[1] challenges a final decision of the Commissioner of Social Security ("Commissioner") regarding his application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, *et seq*. O.W. contends that the administrative law judge ("ALJ") made several errors in evaluating the record evidence, determining O.W.'s residual functional capacity ("RFC"), and in relying on the VE's testimony, including in assessing the number of available jobs. The Commissioner maintains that the ALJ's decision is supported by substantial evidence and free of legal error.

The parties filed their respective briefs. Dkt. Nos. 13, 18, 23. The matter was submitted without oral argument. Civil L.R. 16-5. Upon consideration of the moving and responding papers and the relevant evidence of record, for the reasons set forth below, the Court reverses the Commissioner's decision and remands this case for further administrative proceedings consistent

[1] Because orders of the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by his initials. This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

United States District Court
Northern District of California

with this order.[2]

## I. BACKGROUND

O.W. was 34 years old when he applied for SSI benefits on April 21, 2022. *See* AR[3] 229, 230. He has at least a high school education. His past relevant work includes work as a package handler, assembly line worker, and security guard. *See* AR 81, 86, 466.

O.W. claims that he has been unable to work since April 1, 2022 due to "PTSD, depression, [a] broken hand, [and] broken knee." *See* AR 231, 273. The record indicates that O.W. suffered abuse and neglect as a child, attempted suicide twice (at ages 14 and 31), and was incarcerated for much of his adulthood. *See* AR 466, 1887.

O.W.'s SSI application was denied initially and on review. AR 93-118. The ALJ held a hearing on January 18, 2024, at which a vocational expert ("VE") testified. AR 52-92. The ALJ issued an unfavorable decision on May 1, 2024. AR 31-42.

The ALJ found that O.W. has not engaged in substantial gainful activity since April 21, 2022, the date of his SSI application. AR 33. The ALJ further found that O.W. has the following severe impairments: "schizophrenia, trauma and stressor related disorder, adjustment disorder unspecified, opioid use disorder, and amphetamine use disorder." *Id*. However, the ALJ concluded that O.W. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the Commissioner's regulations. AR 34. The ALJ determined that O.W. has the RFC to "perform a full range of work at all exertional levels," with the following nonexertional limitations: "simple and routine tasks, and he must be able to work independently (meaning other individuals can be in the vicinity, but only incidental interactions are required in order to accomplish the work)." AR 37.

The ALJ found that O.W. is unable to perform any past relevant work. AR 41. However, the ALJ found that he is "capable of making a successful adjustment to other work that exists in

---

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 6, 7.

[3] "AR" refers to the certified administrative record filed with the Court. Dkt. No. 8.

United States District Court
Northern District of California

significant numbers in the national economy," namely, bench hand packager, inspector, and sub-assembler. AR 42. Accordingly, the ALJ concluded that O.W. has not been disabled, as defined by the Act, since the April 21, 2022 date of his SSI application. *Id.*

The Appeals Council denied O.W.'s request for review of the ALJ's decision. AR 1-6. O.W. then filed the present action seeking judicial review of the decision denying his SSI application.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (citation omitted); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citation omitted). In this context, the term "substantial evidence" means "more than a mere scintilla" but "less than a preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ahearn*, 988 F.3d at 1115 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) and *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012), *superseded by regulation on other grounds*); *see also Morgan*, 169 F.3d at 599 (citation omitted). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Ahearn*, 988 F.3d at 1115 (citation omitted); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Ahearn*, 988 F.3d at 1115-16 (citation omitted); *Morgan*, 169 F.3d at 599 (citation omitted).

## III. DISCUSSION

O.W.'s appeal raises seven issues. He contends that the ALJ (1) erred at step two of the sequential analysis by failing to find that O.W.'s right hand and wrist dysfunction, right knee pain, and migraines are not severe medically determinable impairments; (2) improperly rejected the opinion of Laura Catlin, Psy.D., (3) improperly discounted O.W.'s symptom testimony;

(4) improperly rejected lay witness statements, (5) improperly assessed O.W.'s RFC, (6) improperly relied on VE testimony based on an incomplete hypothetical, and (7) failed to resolve discrepancies between the VE's testimony and publicly available job number estimates. *See* Dkt. Nos. 13, 23.

**A. Step Two Analysis**

O.W. argues that the ALJ failed to include his right hand and wrist dysfunction, right knee pain, and migraines among his severe impairments. The Commissioner maintains that the ALJ reasonably determined O.W.'s severe medically determinable impairments and that his step two severity assessment is supported by substantial evidence.

At step two of the five-step sequential analysis, the ALJ must assess the medical severity of a claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *see also Glanden v. Kijakazi*, 86 F.4th 838, 843 (9th Cir. 2023) (reaffirming that the step two analysis is "a de minimis requirement that screens out only frivolous claims."). The step-two analysis "is not meant to identify the impairments that should be taken into account when determining the RFC," because "in assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017) (citation modified; citation omitted).

A severe impairment "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921. The claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (stating that "[t]he burden of proof is on the claimant as to steps one to four" of the sequential analysis). An impairment or combination of impairments is considered "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "Basic work activities are abilities and aptitudes necessary to do most jobs," *Smolen*, 80 F.3d at 1290, including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding,

carrying out, and remembering simple instructions; use of judgement, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting," SSR 85-28, 1985 WL 56856 at *3. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Smolen*, 80 F.3d at 1290 (citing SSR 85-28); *see also Webb*, 433 F.3d at 686 (same).

**1. Right Hand and Wrist**

At the administrative hearing, O.W., who is right-handed, testified that he has trouble gripping things due to his "hand injury," stating that his right hand "cramps up" or "locks up" for 10-20 minutes, around 2-3 times per day. AR 68. When his hand "locks up," O.W. asserts that he cannot do anything with that hand, cannot write well, cannot brush his teeth, and drops things he was holding in that hand. AR 68-69, 79. At step two of the sequential analysis, the ALJ stated that he "considered the claimant's allegation of a right-hand injury," but found the allegation to be "unsupported by the available medical file." AR 33. The ALJ explained that "[t]here were no medical signs or laboratory findings to substantiate the existence of this condition as a medically determinable impairment." AR 34. Here, the ALJ noted May 3, 2023 records indicating that O.W. was treated at Highland Hospital for a right wrist sprain, and x-rays revealed no fracture. *See* AR 34, 1045, 1047.[4]

O.W. argues that the ALJ failed to consider other evidence establishing "medical signs of [O.W.]'s right hand and wrist dysfunction," and points to records indicating that in 2018, following an altercation, O.W. received emergency treatment for "a mildly displaced," "not angulated" fracture at the base of his pinky finger. *See* Dkt. No. 13 at 13; AR 1113, 1133-34. While the Court declines to find that records dated outside the relevant period[5] are *per se*

---

[4] The ALJ also posited that O.W.'s history of vehicle theft is a further basis to question O.W.'s hand injury allegations. AR 34. That reason is speculative and not supported by substantial evidence in the record. The Court finds it unnecessary to belabor the point, as the Commissioner does not rely on that portion of the ALJ's reasoning (*see* Dkt. No. 18 at 6 n.1).

[5] The relevant period to establish disability for SSI claims begins with the date of the claimant's application—here, April 21, 2022. *See* 20 C.F.R. §§ 416.202, 416.305, 416.330, 416.335, 416.501.

immaterial (as the Commissioner seems to suggest), O.W. does not present evidence showing how or why that record bears on his ability to do basic work activities in the relevant period and as testified by O.W. at the administrative hearing.

Nevertheless, O.W. also notes that the same May 3, 2023 emergency treatment records cited by the ALJ indicate that O.W. complained of pain to his wrist, and that several days later, medical staff at the Santa Rita Jail noted "no obvious swelling or deformity," but that O.W. was "completely unable to actively extend his R[ight] hand at his R[ight] wrist," assessed "R[ight] wrist drop (radial nerve palsy)," and gave O.W. a wrist brace. *See* AR 1478, 1052. Subsequent records in June 2023, indicate that O.W. was "able to full[y] extend his R[ight] hand," and "[n]o deformities or swelling" were observed, though some "mild R[ight] hand numbness" remained, and O.W. was instructed to continue wearing the wrist brace. AR 1481. The Court makes no determination as to whether these records establish that O.W. had a hand impairment that is "severe" for step two purposes. However, insofar as the ALJ apparently did not consider these records at all in his step two analysis, he erred.

**2. Right Knee**

The record indicates that in October 2016, O.W. had arthroscopic surgery on his right knee to repair a torn meniscus. *See* AR 1793.[6] At the administrative hearing, O.W. testified that several times per week, he experiences pain (particularly in cold temperatures) and swelling in his right knee, causing difficulty sitting and standing, going up and down stairs, crawling, crouching, kneeling, and climbing ladders. *See* AR 67, 75-76. Although O.W. argues that the ALJ erred in failing to find his knee pain to be an impairment, the ALJ's decision indicates that he did find O.W.'s history of right knee surgery to be a medically determinable impairment. AR 33 (discussing O.W.'s "medically determinable impairment[] of . . . right knee surgery"). However, he found that the impairment does "not cause more than minimal limitations in [O.W.'s] ability to perform basic work activities" and therefore is "nonsevere." *Id.* Here, the ALJ cited a March 11,

[6] Although the ALJ and the Commissioner both state that O.W.'s surgery occurred in December 2016, they appear to cite to a record indicating that on December 27, 2016, Dr. Anand, the orthopedic surgeon who performed the arthroscopy, found that O.W. no longer needed to use crutches. *See* Dkt. No. AR 33, 2423; *see also* Dkt. No. 18 at 7.

2023 examination record in which O.W. was observed with a steady gait, normal range of motion, and no edema noted or reported. AR 1218. The ALJ also cited to the May 3, 2023 Highland Hospital records, showing that O.W. had no swelling, tenderness, deformity, or edema, and his respiration was within defined limits. AR 1045, 1052.

Arguing that these records documenting observations on a given day do not contradict his allegations of "intermittent" weekly symptoms (*see* Dkt. No. 13 at 14), O.W. argues that the ALJ erred by failing to consider records in 2017 showing that he continued to seek care for right knee pain for months after his surgery. These records reflect that on December 27, 2016, orthopedic surgeon Dr. Anand indicated that O.W. no longer needed crutches, should continue with physical therapy, and recommended follow up as needed. *See* AR 2423, 2503. The records further indicate that O.W. experienced some post-operative swelling, and complained of continuing knee pain, stating that his knee was re-injured more than once after his surgery, including in a November 2016 assault in which O.W. said he was hit on the knee with a cane, and a March 2017 yard incident where O.W. stated he was pushed to the ground on his knee. *See* AR 2456-2457, 2517. A March 14, 2017 assessment record indicates that O.W.'s right knee was "intact," with normal range of motion, and that O.W. was ambulating without assistance, "only [complains of] tenderness," and noting "only tenderness when touching knee area." AR 2452-2453. An April 20, 2017 assessment note regarding his knee states "No actual or suspected pain." AR 2459. An April 20, 2017 examination record indicates that O.W. walked with a limp, and that he complained of constant knee pain and reported hearing "something in his knee pop." An examination revealed "[n]o clubbing, cyanosis or edema. No joint effusions, no joint deformities." AR 2443. Noting that the reported re-injuries suggested "the possibility of another meniscal tear is high," medical staff ordered an MRI, the results of which were normal. AR 2440, 2443-2444. O.W. was given non-steroidal anti-inflammatory gel. AR 2427, 2444. A May 2017 record indicates that an examination revealed "[n]o clubbing, cyanosis, or edema. No joint effusions, no joint deformities," "No injuries found," and that exercises were recommended for "flexibility and strengthening of [O.W.]'s knee." AR 2440-2441. In an August 2017 progress note, Angelica Duenas, M.D. reported that "[O.W.] tells me that really days ago he reinjured [his knee], he

slipped on a wet floor." AR 2439. Dr. Duenas's examination noted "some mild effusion," "[n]o clubbing, cyanosis, or edema," "[r]ight knee with a mild crepitation under the patella and pain to palpation anteriorly, medially," and indicates that O.W. is "[a]ble to do any maneuvers at this time." AR 2439. Noting that O.W. already had naproxen for pain, Dr. Duenas recommended that O.W. keep an eye on his knee for about three days, rest and elevate his leg, and use his knee brace daily. AR 2439. The only other record O.W. cites is a page from the report by Laura Catlin, Psy.D., who did not evaluate O.W.'s knee pain. *See* AR 1616.

Viewing the record as a whole, the ALJ's step two evaluation regarding O.W.'s right knee is at least rational and supported by substantial evidence. *Cf. Chasity T. v. Bisignano*, No. 25-cv-02628-RFL, 2026 WL 74277, at *3 (N.D. Cal. Jan. 9, 2026) (ALJ erred in failing to consider records outside disability period where records indicated that plaintiff suffered a stroke with residual deficits continuing into the relevant period). The Court finds no error. *See Ahearn*, 988 F.3d at 1115-16 ("When the evidence can rationally be interpreted in more than one way, the court must uphold the [ALJ's] decision.") (citation omitted).

**3. Migraines**

O.W. argues that the ALJ erred by omitting migraines as a severe impairment, without any discussion. *See* Dkt. No. 13 at 15; Dkt. No. 23 at 4-5. The Commissioner does not dispute that the ALJ did not mention migraines in his step two analysis, but argues that "this was because the record contained no evidence of migraine headaches during the relevant period." Dkt. No. 18 at 7. That is not an explanation offered by the ALJ; indeed, the ALJ did not say why he did not consider migraines in his step two analysis. The Commissioner may not invoke that explanation now as support for the ALJ's opinion. *See Bray v. Comm'r of Soc. Sec.,* 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (stating that the court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely"). Even if that explanation had been articulated by the ALJ, it would not be

persuasive. As discussed above, the Court declines to find that evidence outside the relevant disability period is inherently irrelevant.

O.W. notes that migraines are documented in the medical record. *See* Dkt. No. 13 at 15 (citing AR 1088, 1897, 1898, 2111, 2136, 2166, 2168, 2173, 2193, 2196, 2226, 2264, 2360, 2400). O.W. highlights certain records that he says "demonstrate[] a pattern of treatment-resistant migraines that did not resolve despite [O.W.] using prescription" medications. *See* Dkt. No. 23 at 4 (citing AR 2111, 2173, 2264, 2400). Other records seem to indicate that O.W. subsequently was noted to be stable and his migraines controlled on different medication. *See, e.g.,* AR 1835, 1839, 1848, 1850, 1861, 2101. In any event, on this record, the ALJ erred by failing to address O.W.'s migraines at all in his step two analysis, without explanation. *See Cullen v. Saul*, No. 18-cv-01576-RMI, 2019 WL 3430618, at *9 (N.D. Cal. July 30, 2019) ("It is not for this court to evaluate the ignored evidence in the first instance, assign it weight, and then reweigh it against the other evidence of record, or to provide any post hoc justification for the ALJ's failure to consider it at Step Two. Instead, this court is tasked with reviewing the ALJ's evaluation of that evidence.").

**B. Laura Catlin, Psy.D.**

O.W. arranged for an independent psychological disability evaluation by Laura Catlin, Psy.D. AR 1615-1628. Dr. Catlin examined O.W. on October 26, 2023. As part of her evaluation, Dr. Catlin reviewed O.W.'s records, conducted a clinical interview and mental status examination of O.W., and administered several tests, including WAIS-IV—Wechsler Adult Intelligence Scale, MoCA—Montreal Cognitive Assessment, BDI-Beck Depression Inventory, and PCL-5-PTSD Checklist for DSM-5. AR 1615-16. Dr. Catlin's diagnostic impression included schizoaffective disorder, depressed type (rule out major depressive disorder, recurrent, with psychotic features); substance use disorder; borderline intellectual functioning; and PTSD. AR 1622. In the four areas of mental functioning, Dr. Catlin assessed O.W. with mild, moderate, and marked limitations in his ability to understand, remember, and apply information; marked and extreme limitations in his ability to interact with others; mild and moderate limitations in his ability concentrate, persist, or maintain pace; and mostly marked limitations in his ability to adapt

or manage himself (with other functions in this category noted as being unlimited or only mildly limited). AR 1626-27. Dr. Catlin opined that O.W. "would be absent from work 4 or more days per month," and "would miss significantly more than 4 days of the [sic] work per month, even in a low-stress job." AR 1627. She further opined that O.W. would be off-task for approximately 20% of an 8-hour workday and would require unplanned breaks each day (in addition to a morning, lunch, and afternoon break). AR 1627-1628. Additionally, Dr. Catlin noted that due to "[his] pride," O.W. "indicat[ed] a resistance to admitting his mental health problems," and "will have difficulty being able to consistently engag[e] with treatment." *Id.*

The ALJ found Dr. Catlin's opinion "unpersuasive because of its lack of supportability and inconsistency with the evidence of record." AR 40. He found Dr. Catlin's assessed marked and extreme limitations in O.W.'s mental functioning to be "extreme" and "not supported by the record as a whole." *Id.* As an example, the ALJ stated that Dr. Catlin's "extreme" limitation in O.W.'s ability to cooperate with others and her "marked" limitation in O.W.'s ability to ask for help "are contrary to what is seen [in] the record evidence and prison records such as being able to seek medical care when needed and [coop]erating with medical professionals and law enforcement, even when going through withdrawal." *Id.* (citing AR 421, 938-39, 983, 990, 996, 1002, 1013, 1018, 1028, 1038, 1044-45, 1618-19, 1623, 1645, 1724, 1726, 1746, 1749). O.W. argues that the ALJ's reasons for rejecting Dr. Catlin's opinion are not supported by substantial evidence. Dkt. No. 13 at 15-19; Dkt. No. 23 at 6. The Commissioner maintains that the ALJ's evaluation of Dr. Catlin's opinions "represent a reasonable interpretation" of the evidence and is consistent with substantial evidence in the record. Dkt. No. 18 at 12.

Under the regulations that apply to O.W.'s application, the Commissioner does not give specific evidentiary weight to medical opinions, including the deference formerly given to the opinions of treating physicians. *See Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022) ("For claims subject to the new regulations, the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies."). Instead, the Commissioner evaluates the "persuasiveness" of all medical opinions and prior administrative medical findings in the record based on: (1) supportability;

(2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 416.920c(c). An ALJ's decision "including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Woods*, 32 F.4th at 787.

Supportability and consistency are considered the most important factors, and the ALJ is required to explicitly address them in his or her decision. 20 C.F.R. § 416.920c(a), (b)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods*, 32 F.4th at 791-92 (quoting 20 C.F.R. § 404.1520c(c)(1)). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Woods*, 32 F.4th at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)). "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). The ALJ "may, but [is] not required to," explain how he or she considered the remaining three factors listed in the regulations. *Id*. § 416.920c(b)(2).

With respect to supportability, the ALJ failed to engage with Dr. Catlin's assessment in any meaningful sense. His analysis of the supportability factor is limited to the statement that Dr. Catlin's mental function assessment is "not supported by the record as a whole," and a passing reference to a few pages from Dr. Catlin's report encompassing her mental status examination of O.W. and a portion of his test results and her assessment. *See* AR 40 (citing 1618-19, 1623). From this abbreviated analysis, the Court infers that the ALJ found that Dr. Catlin's ultimate assessment regarding O.W.'s mental functioning is not supported by the fact that Dr. Catlin found O.W. to be generally polite and engaged in her evaluation. But while she did note some "normal"

or otherwise benign findings in her mental status exam, she also reported that O.W. was tense, had a flat affect, showed little emotion, had some difficulty maintaining appropriate eye contact, was positive for auditory hallucinations, and reported some suicidal thoughts. AR 1618. Dr. Catlin provided a detailed description of her test administration and O.W.'s test results, as well as an assessment, spanning multiple pages, explaining her findings and conclusions regarding O.W.'s mental functioning. *See* AR 1622-28. The ALJ's conclusory statement that Dr. Catlin's findings are "not supported by the record as a whole" fails to substantively engage with Dr. Catlin's analysis.

With respect to the consistency factor, the ALJ cited to a number of O.W.'s records, mostly during periods of incarceration, stating that they demonstrate O.W.'s ability "to seek medical care when needed" and to "[coop]erat[e] with medical professionals and law enforcement, even when going through withdrawal." AR 40 (citing AR 421, 938-39, 983, 990, 996, 1002, 1013, 1018, 1028, 1038, 1044-45, 1645, 1724, 1726, 1746, 1749). These records do reflect O.W. seeking medical care (e.g., for a foot abrasion, or requesting to be reinstated on his medications in prison) and otherwise engaging in or cooperating with mental health and other treatment while incarcerated. O.W. notes that there are a number of records, principally during periods of incarceration, documenting that O.W. repeatedly refused to participate in treatment or take his medication, violated prison rules and had multiple disciplinary reports (e.g., for fighting, distributing drugs, disobeying a direct order, and refusing to work), got into violent altercations with other inmates, and minimized his need for treatment. *See, e.g.* AR 421, 440, 711-713, 725, 727, 728, 733, 735-738, 742, 744, 745, 747-750, 754-760, 761-763, 769-773, 778, 995, 996, 1026, 1617, 1887, 2033, 2467. Courts have found that prisons are "highly structured settings that may minimize a claimant's psychological symptoms." *Clark v. Berryhill*, No. 17-cv-00371-JCS, 2018 WL 3659052, at *29-30 (N.D. Cal. Aug. 2, 2018) (finding that claimant's "periods of incarceration were the most highly structured and supportive periods of his life" and that ALJ should have considered that claimant's symptoms "may have been minimized during periods of incarceration because he was living in a highly structured environment"); *see also Pittaluga v. Comm'r of Soc. Sec.*, No. 18-cv-03067-VC, 2019 WL 2897849, at *1 (N.D. Cal. July 5, 2019)

(questioning "that jail records would provide the most accurate portrayal of a claimant's mental health conditions . . . because the jail environment is highly structured[.]"). Indeed, some of the same records cited by the ALJ reflect that O.W. was uncooperative, confrontational, or disengaged/avoidant, and was observed to be "disheveled," malodorous, and mumbling with impaired judgment and impulse control, particularly on dates when records indicate O.W. was rearrested and brought back into custody. *See, e.g.,* AR 990, 1018, 1645. Insofar as the ALJ's analysis does not account for the fact that he compares Dr. Catlin's (out of custody) assessment to other records which are based largely on (in custody) assessments by prison healthcare providers, the Court finds that the ALJ's analysis of the consistency factor is not supported by substantial evidence.

**C. O.W.'s Symptom Testimony**

O.W. argues that the ALJ erred by failing to provide sufficiently specific reasons for discounting his symptom testimony, supported by substantial evidence. Dkt. No. 13 at 19-24; Dkt. No. 23 at 7-8. The Commissioner argues that the ALJ reasonably found that O.W.'s testimony and subjective statements are not consistent with the record. Dkt. No. 18 at 7-10.

**1. Legal Standard**

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014). Unless an ALJ finds that the claimant is malingering, when an ALJ determines that a claimant has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms alleged, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." *Ferguson v. O'Malley*, 95 F.4th 1194, 1197-98 (9th Cir. 2024) (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015)); *see also Treichler*, 775 F.3d at 1102. "This requires the ALJ to 'specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony.'" *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (quoting *Treichler*, 775 F.3d at 1102). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness,

inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (citation modified; citations omitted). "The standard isn't whether [the] court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)).

**2. O.W.'s Symptom Testimony**

O.W. claims that he has been unable to work since April 1, 2022 due to "PTSD, depression, [a] broken hand, [and] broken knee." *See* AR 231, 273. Additionally, at the administrative hearing, O.W. testified that he gets migraines. AR 62. If he were working today, O.W. stated that his physical and/or mental health symptoms would require him to take 3-4 breaks per day, for 10-30 minutes at a time, and that he would be absent from work 5 days per month. AR 69-70.

With respect to mental health issues, O.W. testified that due to "[his] paranoia and PTSD," he has issues "with people walking behind [him]," and while working for a parcel shipping company, he would "get into a verbal altercation with people working behind [him]." AR 63-64. He testified that his PTSD causes him to feel "nervous and paranoid" around large crowds, which can be "two people." AR 66. He testified that his job working security at a sports arena ended because he "[w]alked off [the] job . . . [m]ainly because [he] was paranoid of being around other people." AR 65-66; *see also* AR 61-62. O.W. stated that his mental health issues caused him to struggle with attendance at work, and that on average, he missed 5 workdays per month. AR 69. O.W. testified that, due to his mental health issues, he still has trouble getting out of bed 2-3 times per week. AR 69. He noted that once, when he tried to take public transportation, he got off the bus before taking a seat because he "got nervous and paranoid because of the people on the bus." AR 73. Additionally, he stated that he has been in more than 50 physical altercations and more than 50 verbal altercations with others, and that the basis of these fights is generally "[s]omebody

bump[ing] into [him] or staring at [him] or a voice in [his] head telling [him] that somebody is talking about [him]." AR 70-71. He stated that he has more hallucinations than what he reports to doctors, and that the same is true of his mental health symptoms in general. AR 72-73.

O.W. testified that he experiences auditory and visual hallucinations, even when he is sober, and even when he takes medication. AR 71-72, 80. He stated that he last used heroin about 3-4 months before the administrative hearing, and last used crystal meth about a year prior to the administrative hearing. AR 79-80. O.W. testified that he has not noticed any difference in his mental health symptoms when he is using substances, as opposed to when he is not.[7] AR 80.

O.W. noted that on the day before the administrative hearing, he was released from a 35-day incarceration period. AR 78. He stated that he was most recently prescribed Suboxone, Abilify, and Buspar while incarcerated, but that he has not taken his prescribed medication while out of custody. AR 74. He later testified that he was getting ready to pick up his medications from a pharmacy, and that he previously did not take his medications while out of custody because "it's an ego . . . thing" and he "feel[s] like [he can] do it on [his] own." AR 77.

With respect to migraines, O.W. testified that his job with a parcel shipping company ended after a month or two, when he "got into it with a supervisor" for "taking too many breaks . . . . [b]ecause of [his] migraines." AR 64. He testified that the breaks would last 30 or 45 minutes and that he needed to take such breaks at "[a]nytime of day." AR 65. He stated that he still has migraines 3-4 times per week, with each migraine lasting 15-30 minutes. *Id.*

With respect to his right knee, O.W. testified that several times per week, he experiences pain (particularly in cold temperatures) and swelling in his right knee, causing difficulty sitting and standing, going up and down stairs, crawling, crouching, kneeling, and climbing ladders. *See* AR 67, 75-76. When his knee is not swollen, O.W. stated he can sit for about 45-60 minutes before he needs to move, stand for about 1 hour, and walk about 45-60 minutes before needing a break. AR 75-76. He testified that his assembly line job at an automobile company ended because he took too many breaks for his knee. He stated that the job required standing for 12

[7] The ALJ did not conduct a Drug Addiction and Alcoholism analysis, and no party suggests on review that such an analysis should have been done.

hours per day. Due to his knee problems, he needed to take breaks 3 or four times per week, for about 15 or 20 minutes at a time. AR 66-67.

With respect to his hand, O.W. testified that he has trouble gripping things due to his "hand injury," stating that his right hand "cramps up" or "locks up" for 10-20 minutes, around 2-3 times per day. AR 68. When his hand "locks up," O.W. stated that he cannot do anything with that hand, cannot write well, cannot brush his teeth, and drops things he was holding in that hand. AR 68-69, 79. He testified that the heaviest item he can lift with his right hand is a gallon of milk. AR 68-69.

**3. Analysis**

The ALJ considered O.W.'s symptom testimony, including testimony about migraines. *See* AR 38. However, it is unclear whether or to what extent evidence regarding O.W.'s migraines factored into the ALJ's evaluation of O.W.'s symptom testimony. For the reasons discussed above, the ALJ erred in failing to consider O.W.'s migraines at all at step two of the sequential analysis, requiring remand. Depending on what the ALJ determines with respect to O.W.'s migraines at step two, further assessment may also be required with respect to his migraine symptom testimony.

With respect to the medically determinable impairments the ALJ did assess, he found that they "could reasonably be expected to cause some of the alleged symptoms[.]" AR 38. The ALJ made no finding of malingering. The ALJ discounted O.W.'s symptom testimony regarding the intensity, persistence, and limiting effects of his symptoms as inconsistent with "a somewhat normal level of daily activity and interaction" and with "mostly routine, conservative, and non-emergency treatment since the alleged onset date." *Id.* Additionally, the ALJ found that "[t]he consistency of the claimant's allegations regarding the severity of his symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record," and that "[o]verall, the longitudinal evidence of record confirms the claimant has just not been limited by the symptoms of his conditions to the point of total disability." AR 39.

**a. Activities**

A claimant's daily activities may support an adverse credibility finding if the claimant is

able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting. *Orn,* 495 F.3d at 639. The Ninth Circuit has recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) (citation modified; citation omitted). Thus, "[o]nly if the level of activity is inconsistent with [a] [c]laimant's claimed limitations do daily activities have any bearing on [a] [c]laimant's credibility." *Ferguson*, 95 F.4th at 1203 (citation modified; citation omitted).

In discounting O.W.'s symptom testimony, the ALJ noted that O.W. "admitted activities of daily living including the ability to go [out] in public by grocery shopping alone and is able to make simple meals," "reading, exercising, coloring, and working in the [prison] housing unit," and "talking with his family." AR 38. Here, the ALJ cited (1) Dr. Catlin's report in which she noted that O.W. stated that "[h]e is able to go grocery shopping by himself" and "to make a simple microwavable meal" (AR 1616); (2) a September 2023 mental health treatment record indicating that when asked by prison medical staff "about coping skills," O.W. stated "that he had been reading, exercising, coloring, and working in the H[ousing] U[nit]." (AR 1726); and (3) a November 2023 prison mental health assessment indicating that O.W. reported that "talking to his family helps him to manage his anxiety" (AR 1742). The ALJ explained that "[t]hese activities, such as the ability to read, color and prepare meals—while basic—do show an ability to concentrate and engage in simple tasks for at least a period of time. The ability to go out in public alone and engage with family members shows at least some ability to interact with others." AR 38.

The ALJ did not sufficiently explain why he found the level of these activities to be inconsistent with symptoms alleged by O.W., who does not claim that he is completely unable to interact with others or engage in activities like reading or coloring. Nor is it clear how or why O.W.'s "coping" activities are inconsistent with his allegations about being unable to function in a workplace environment. *See Garrison*, 759 F.3d at 1016 (cautioning that "impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."); *Vertigan v. Halter*, 260 F.3d

1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability."). The ALJ also did not explain how these activities meet the threshold for full-time work. There is no evidence describing O.W.'s pod work or indicating how often he engaged in these "coping" activities and for what portion of his day. Because the ALJ provided no clear and convincing reasons that O.W.'s activities contradict his testimony or meet the threshold for full-time work, these activities are not an adequate basis for the ALJ to discredit O.W.'s testimony. *See Smith v. Kijakazi*, 14 F.4th 1108, 1114 (9th Cir. 2021).

**b. Medical Evidence and Conservative Treatment**

The ALJ found "the alleged intensity, persistence, and limiting effects of [O.W.'s] symptoms" to be "inconsistent with the objective medical evidence because those allegations are greater than expected in light of the objective evidence of record." AR 37. The ALJ further stated, "Even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, in view of the relatively benign medical evidence, discussed below." AR 37-38. The ALJ summarized O.W.'s symptom testimony and medical evidence. *See* AR 38-40. The ALJ concluded that while O.W. "is likely to have some mental limitations," his records show "many normal mental status evaluations" and "[h]e has had very consistent and unremarkable mental health treatment and was still able to seek out medical care when needed; he was cooperative with medical professionals and law enforcement even when going through withdrawal." AR 40.

O.W. argues that the ALJ failed to identify the specific testimony he rejected, and thus, also failed to identify the evidence that undermines any particular testimony. *See* Dkt. No. 13 at 20. In *Brown-Hunter*, the Ninth Circuit concluded that the ALJ erred, explaining that "[b]ecause the ALJ failed to identify the testimony she found not credible, she did not link that testimony to the particular parts of the record supporting her non-credibility determination." *Brown-Hunter*, 806 F.3d at 494. In *Lambert*, the ALJ provided "a relatively detailed overview of [the claimant]'s medical history," along with "four high-level reasons as to why [the claimant]'s allegations were

'less than fully consistent with the evidence.'" *Lambert*, 980 F.3d at 1277. The ALJ's four reasons were (1) the claimant "had 'not generally received the type of medical treatment one would expect for a totally disabled individual'"; (2) "the 'record reflect[ed] significant gaps in [her] history of treatment and relatively infrequent trips to the doctor for the allegedly disabling symptoms'"; (3) the claimant's "'use of medications does not suggest the presence of impairments which is more limiting than found in [the ALJ's] decision'"; and (4) the claimant's "medications have been relatively effective in controlling [her] symptoms.'" *Id*. at 1270. The Ninth Circuit found the ALJ's analysis was insufficient, as it consisted of "non-specific conclusions that [the claimant]'s testimony was inconsistent with her medical treatment." *Lambert*, 980 F.3d at 1277-78.

The Commissioner argues that the ALJ reasonably discounted O.W.'s symptom testimony, because he "summarized [O.W.]'s testimony about his limitations," "specifically identified inconsistencies" with O.W.'s medical evidence and treatment history, and offered more than the "single general statement" found insufficient in *Brown-Hunter*. *See* Dkt. No. 18 at 10. While an ALJ is not required "to perform a line-by-line exegesis of the claimant's testimony," or to "draft dissertations when denying benefits," *Lambert*, 980 at 1277, the issue remains that the ALJ did not link the testimony he found inconsistent to the particular parts of the record supporting his evaluation of O.W.'s symptom testimony. *See, e.g., Tayag v. Comm'r of Soc. Sec.*, No. 25-cv-06785-BLF, 2026 WL 2654822, at *8 (N.D. Cal. Sept. 8, 2026) (ALJ's general assertions of inconsistency with "only mild or minor radiograph and physical examination findings, as well as improvement with treatment and also, by the mostly normal range mental status evaluation findings and inconsistent but good activities of daily living" are conclusory and insufficient "because the ALJ does not identify which statements are inconsistent or provide specific reasons for the purported inconsistency."); *Bernal v. Berryhill*, No. 16-cv-04317-JST, 2018 WL 1989503, at *5 (N.D. Cal. Mar. 26, 2018) (ALJ's analysis insufficient where the ALJ did not "identify a specific portion of [claimant]'s testimony that is contradicted by 'third party reports' and that the ALJ deemed not credible in view of this evidence."). That is an analysis that the ALJ must make in the first instance. *See Brown-Hunter*, 806 F.3d at 494 ("Although the inconsistencies identified

by the district court could be reasonable inferences drawn from the ALJ's summary of the evidence, the credibility determination is exclusively the ALJ's to make, and ours only to review.").

With respect to the remainder of the ALJ's analysis, the record reflects that O.W. has spent much of his adulthood in prison, where he received most of his treatment, including prescription medications such as Abilify, Buspar, and Remeron, and placement in the prisons' therapeutic and/or behavioral health units. *See, e.g.,* AR 442 (noting history of 13 years in prison), 452 (placement in behavioral health unit), 459 (placement in behavioral health unit), 985 (placement in therapeutic housing unit and "standard IOL [intensive observation log]"), 990 (placement in therapeutic housing unit), 996 (prescribed Abilify, Buspar, and Remeron), 1004 (psychotherapy treatment). As an initial matter, the Court questions whether anti-anxiety medications/antidepressants and psychotherapy are properly considered "conservative" treatment. *See, e.g., Wyatt A. v. O'Malley*, No. 24-cv-00712-SK, 2024 WL 5162651, at *3 (N.D. Cal. Dec. 17, 2024) ("Courts within the Ninth Circuit have repeatedly held that taking psychiatric medications, including antipsychotics and antidepressants such as the medications taken by Plaintiff, is not considered conservative treatment.") (citing cases); *Lanh H. v. Kijakazi*, No. 23-cv-03727-RMI, 2024 WL 4133805, at *9 (N.D. Cal. Sept. 9, 2024) (observing that "psychotherapy and counseling are customary and generally accepted treatments for anxiety and depression regardless of severity, not 'conservative' treatments reserved only for mild cases.").

The Court also remains concerned whether substantial evidence supports the ALJ's characterization of the medical record. While the ALJ cites a number of records that document mental status examinations showing that O.W. was, for example, cooperative, alert and oriented, and generally found to be within normal limits, most of the records occurred in a controlled and structured prison context. *See Clark*, 2018 WL 3659052, at *29-30; *see also Pittaluga*, 2019 WL 2897849, at *1. Even as to records during O.W.'s incarceration, while the ALJ correctly notes that a November 2023 mental status exam reflects that O.W. was largely "W[ithin] N[ormal] L[imits]," that same report also documents that O.W. "appeared to be under the influence," "was falling asleep," and "had to be redirected and woken up to answer nearly every question."

AR 1645-46. As discussed above, O.W. notes that there are a number of records documenting that O.W. refused to participate in treatment or take his medication, violated prison rules and had multiple disciplinary reports (e.g., for fighting, distributing drugs, disobeying a direct order, and refusing to work), got into violent altercations with other inmates, and minimized his need for treatment. *See, e.g.* AR 421, 440, 711-713, 725, 727, 728, 733, 735-738, 742, 744, 745, 747-750, 754-760, 761-763, 769-773, 778, 995, 996, 1026, 1617, 1887, 2033, 2467. Additionally, some of the records cited by the ALJ concern medical visits during which O.W.'s mental status was observed and recorded in brief notations, but was not being tested, and was unrelated to the issue for which he was being seen and examined, including for an abrasion on his foot (AR 938-939), and when he was brought to the hospital by police for medical clearance, prior to incarceration, regarding O.W.'s sprained wrist (AR 1044-45). *See generally L.L. v. Kijakazi*, No. 20-cv-07438-JCS, 2022 WL 2833972, at *12 (N.D. Cal. July 20, 2022) (ALJ erred in relying on "'cherry-picked observations regarding [claimant]'s presentation that were unrelated to the issue for which [claimant] was being seen and examined); *T.N. v. Kijakazi*, No. 20-cv-04946-TSH, 2021 WL 4553581, at *9 (N.D. Cal. Oct. 5, 2021) (same).

* * *

Accordingly, the Court finds that the ALJ did not provide sufficiently specific, clear and convincing reasons, supported by substantial evidence, for discounting O.W.'s symptom testimony. In so ruling, the Court makes no findings regarding the veracity of O.W.'s testimony or the ALJ's conclusion that the testimony is not credible. On remand, the ALJ should reevaluate O.W.'s credibility and more thoroughly explain his findings and support his conclusion with specific, clear and convincing reasons and evidence.

**D. Lay Witness Statements**

Two friends of O.W., Tiffany Wess and Anthony Stovall, submitted statements describing their observations of his physical and mental symptoms and their effect on his functioning. AR 339-345. O.W. argues that the ALJ erred by rejecting those statements without stating "germane reasons" supported by substantial evidence. Dkt. No. 13 at 24; Dkt. No. 23 at 5-6. The Commissioner maintains that the "germane reasons standard" does not apply to O.W.'s claim and

United States District Court
Northern District of California

that, in any event, the ALJ appropriately considered the statements from Ms. Wess and Mr. Stovall. Dkt. No. 18 at 12-15.

Historically, lay witness testimony has been considered competent evidence that can help determine a claimant's limitations, and the Ninth Circuit previously required that "[i]f the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). Under the amended regulations that apply to claims, such as O.W.'s, filed on or after March 27, 2017, an ALJ is "not required to articulate how [he] considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c) in [20 C.F.R. § 416.1520c]." 20 C.F.R. § 416.920c(d). In view of the agency's amended regulations, the Commissioner argues that the "germane reasons standard" does not apply to O.W.'s claim. O.W. disagrees. As of the time the parties submitted their briefing to this Court, the Commissioner acknowledged that there was no published guidance from the Ninth Circuit on this point. *See* Dkt. No. 18 at 14. Recently, the Ninth Circuit has stated that the agency's amended regulations did not abrogate the "germane reasons" standard for discrediting lay witness statements. *See Fain v. Bisignano*, — F.4th —, No. 25-3219, 2026 WL 2795427, at *5 (9th Cir. Sept. 18, 2026).

For present purposes, this issue is of no moment, as the ALJ's decision indicates that he discounted Ms. Wess's and Mr. Stovall's statements for the same reasons he discounted O.W.'s symptom testimony. The ALJ stated that he considered the statements by Ms. Wess and Mr. Stovall, noting that Ms. Wess "stated the claimant would get into fights with strangers when she was with him" and that Mr. Stovall "noted he witnessed the claimant having nightmares." AR 38. While the ALJ found Ms. Wess's and Mr. Stovall's statements "helpful," he said that he "considered them in the same way [he has] considered the claimant's testimony regarding the same," and concluded that the lay witness statements "are not corroborated in the other record evidence." AR 38. For the reasons discussed above, the Court finds that the ALJ did not provide sufficient reasons supported by substantial evidence in discounting O.W.'s symptom testimony. While the standard governing the evaluation of a claimant's symptom testimony is not the same as that for evaluating lay witness statements, the ALJ did not provide any other reasons, specific to

Ms. Wess or Mr. Stovall, beyond those that the Court has already considered. Thus, to the extent the ALJ provided reasons for discounting Ms. Wess's and Mr. Stovall's statements, those reasons are not supported by substantial evidence in the record.

**E. RFC**

A claimant's RFC "is the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ assesses a claimant's RFC "based on all the relevant evidence in [the] case record." *Id.*; *see also id.* § 416.945(a)(3). O.W. argues that the ALJ's RFC determination is flawed, and the parties reiterate their respective positions on the issues discussed above. *See* Dkt. No. 13 at 25-26; Dkt. No. 18 at 15.

As discussed above, the Court concludes that the ALJ erred in several respects, including at step two of the sequential analysis and in evaluating Dr. Catlin's opinion, O.W.'s symptom testimony, and the lay witness statements submitted by Ms. Wess and Mr. Stovall. The ALJ's assessment of O.W.'s RFC was, therefore, tainted by these errors and was not supported by substantial evidence. Accordingly, on remand, the ALJ is required to reassess O.W.'s RFC in accordance with the Court's rulings on the other issues above.

**F. VE Testimony**

**1. Incomplete Hypothetical**

O.W. argues that the ALJ erred by relying on VE testimony based on an incomplete hypothetical that did not properly account for his limitations. The parties' arguments on this issue are derivative of those presented on the preceding issues, as to which the Court has determined that remand is required and which may also impact further proceedings regarding any VE testimony. *See* Dkt. No. 13 at 26-27; Dkt. No. 18 at 15.

**2. VE Testimony and Job Number Estimates**

At step five of the sequential analysis, an ALJ must decide if there is a significant number of jobs in the national economy that a person with a claimant's limitations, age, education, and experience can perform. *Powley v. Bisignano*, 169 F.4th 1158, 1161 (9th Cir. 2026) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). In making that determination, an ALJ may seek guidance from a VE. *Id.* (citing 20 C.F.R. §§ 416.960(b), 416.966(e)). O.W. argues that in

concluding that he can perform other jobs that exist in "significant numbers in the national economy" (AR 42), the ALJ erred by failing to reconcile the VE's testimony with available job number estimates. Specifically, O.W. contends that publicly available information shows that the number of available jobs is much lower than what the VE testified to at the administrative hearing, and is not a "significant" number. Dkt. No. 13 at 27-28; Dkt. No. 23 at 8-10. Although the Court has determined that remand is required on several issues that may impact issues concerning any VE testimony, the Court addresses here the parties' dispute about whether O.W. forfeited this argument and if not, whether the evidence purported to be inconsistent with the VE's testimony is probative and significant. *See* Dkt. No. 18 at 16-18; Dkt. No. 18 at 15-18; Dkt. No. 23 at 8-10.

**a. Forfeiture**

There is no dispute that O.W., who was represented by counsel in the administrative proceedings, raised the issue of the VE's methodology and job numbers for the first time with the Appeals Council. In a July 25, 2024 brief to the Appeals Council, requesting review of the ALJ's decision, O.W. submitted additional evidence of job estimates that he represented were found on SkillTRAN. Nine pages of job information appended to O.W.'s letter indicate that they comprise a "Report produced from SkillTRAN Online Services – by SkillTRAN LLC – www.skilltran.com." AR 389-408.

In April 2025, the Appeals Council informed O.W. that it denied his request for review. AR 1-6. The Appeals Council's notice stated: "You submitted reasons that you disagree with the decision. We considered the reasons and exhibited them on the enclosed Order of the Appeals Council. We found that the reasons do not provide a basis for changing the Administrative Law Judge's decision." AR 1. The enclosed Order indicates that the Appeals Council received O.W.'s July 25, 2024 brief, including the appended job numbers information, as "additional evidence" that the Appeals Council made part of the record. *See* AR 5-6.

Relying on *Shaibi v. Berryhill*, 883 F.3d 1102 (9th Cir. 2017), the Commissioner argues that O.W.'s failure to raise the jobs-number issue before the ALJ at all, including in post-hearing briefing, means that he has forfeited the issue before this Court. In *Shaibi*, the Ninth Circuit held that "a claimant must, at a minimum, raise the issue of the accuracy of the expert's estimates at

some point during administrative proceedings to preserve the challenge on appeal in federal district court." *Shaibi*, 883 F.3d at 1103; *see also Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (concluding that claimant waived argument regarding new evidence of job statistics that "she admittedly failed to raise at both her hearing before the ALJ and the Appeals Council."). The Commissioner maintains that *Shaibi* requires a claimant to raise an issue before the ALJ, at least in a "general sense," to preserve the issue for review. *See* Dkt. No. 18 at 16 (quoting *Shaibi*, 883 F.3d at 1110). O.W. urges the Court to follow *White v. Kijakazi*, 44 F.4th 828 (9th Cir. 2022), in which the Ninth Circuit observed that although the claimant submitted his job number evidence to the Appeals Council, rather than to the ALJ, "[t]his distinction is not fatal," noting that "[u]nder SSA regulations, a claimant has a right to submit additional evidence to the Appeals Council, which the agency may choose to make part of the administrative record where it finds that certain conditions are met[.]" *White*, 44 F.4th at 837. The Commissioner points out that, consistent with *Shaibi*, the claimant in *White* questioned the VE about job number methodology during the administrative hearing. *See* Dkt. No. 18 at 16 (citing *White*, 44 F.4th at 831-32). The Commissioner maintains that unlike the claimant in *White*, O.W. indisputably "did not raise the job number issue in . . . any sense at the hearing before the ALJ" and thus forfeited his argument regarding purported inconsistencies in the VE's job numbers. *See* Dkt. No. 18 at 16-17.

In *Obrien v. Bisignano*, 142 F.4th 687 (9th Cir. 2025), the Ninth Circuit rejected a bright-line issue-exhaustion requirement. *Obrien*, 142 F.4th at 700 (rejecting contention that *Meanel* and *Shaibi* require claimants to exhaust all issues at their administrative hearings). Rather, the "'critical feature' in the issue-exhaustion analysis is 'whether claimants bear the *responsibility* to develop issues for adjudicators' consideration.'" *Id.* at 701 (citations omitted). *Obrien* reaffirmed that "the actual reasoning and results of" *Meanel* and *Shaibi* remain "largely intact," to the extent both cases hold "that the responsibility for presenting such additional evidence concerning the vocational expert's job numbers rested with the claimants and their counsel," and that "claimants generally may not present new evidence, and new issues dependent on that evidence, that they failed to present to the ALJ." *Id.* at 701. *Obrien* would thus appear to support a finding of forfeiture with respect to O.W.'s job-numbers evidence, which was never presented to the ALJ.

At the same time, however, *Obrien* also recognized that "[a] forfeiture occurs when a party fails 'to make the timely assertion of a right' in accordance with the governing procedural requirements that are set forth in the applicable statutes, rules, orders, or case authority." *Obrien*, 142 F.4th at 694. The Ninth Circuit has also recognized that "[t]he Appeals Council is the final level of SSA's administrative review," and "[u]nder SSA regulations, a claimant has a right to submit additional evidence to the Appeals Council, which the agency may choose to make part of the administrative record where it finds that certain conditions are met, as it appears to have done here." *White*, 44 F.4th at 835, 837. Indeed, "[w]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012). Accordingly, because O.W. raised the issue with the Appeals Council and submitted further evidence that is part of the administrative record, his argument is preserved for the Court's review.

**b. Significant and Probative**

A claimant may challenge a VE's testimony regarding the number of jobs available in the national economy by presenting, for example, "counter job-number evidence to rebut the VE's conclusions." *Powley*, 169 F.4th at 1161. "In that event, if the counter evidence is 'significant and probative,' then the ALJ has a duty to address and resolve the inconsistency." *Id.* (citing *Wischmann v. Kijakazi*, 68 F.4th 498, 505 (9th Cir. 2023)). Courts "consider on a case-by-case basis whether new evidence submitted by a claimant is 'meritless or immaterial' or has 'significant probative' value." *Id.* at 1166 (quoting *Wischmann*, 68 F.4th at 506)). If the new evidence is probative and significant, courts "must remand to the ALJ to address the inconsistency in the record evidence." *Id.* Analysis generally begins by "addressing whether counter evidence is probative before looking to whether the counter evidence is significant." *Id.*

Counter evidence may be probative where it "was produced using a data source and methodology frequently relied on by the SSA." *White*, 44 F.4th at 837; *see also Powley*, 169 F.4th at 1167. Here, O.W.'s request for reconsideration to the Appeals Council indicates that the

appended counter evidence was "found on SkillTRAN." AR 398. Although O.W.'s counsel does not explain how the job numbers in the counter evidence were generated, the appended evidence indicates that the information was gathered by pulling data concerning the same DOT code identified by the VE for the jobs in question. *See* AR 400-408. *White* and *Powley* generally observe that SkllTRAN is "recognized to be widely relied upon by vocational experts in estimating the number of relevant jobs in the national economy." *See Powley*, 169 F.4th at 1167 (citing *White*, 44 F.4th at 837) (citation modified). The Commissioner correctly notes that there is no evidence regarding what methodology the VE used to estimate job numbers. *See* Dkt. No. 18 at 17. That is a relevant consideration, though not a dispositive one, as a claimant's counter evidence need not "mirror that of a VE's in source and methodology." *Powley*, 169 F.4th at 1167. Here, O.W.'s counsel made no concessions about the accuracy of the counter evidence, and the record reflects that counsel "used only data sources 'frequently relied on by the SSA.'" *Id*. at 1168 (quoting *White*, 44 F.4th at 837). While O.W.'s counsel's expertise in calculating job numbers is not readily apparent from the record, as in *Powley*, the Court finds no basis to conclude that the deficiency dooms O.W.'s counter evidence. *See id.* Although the record is silent as to the version of the software O.W.'s counsel may have used, as noted above, the printouts submitted by O.W. indicate the data sources from which the data was pulled, including the U.S. Census Bureau and the U.S. Department of Labor. *See id*. at 1168-69 (noting that claimant used U.S. Census Bureau data and position titles and DOT codes corresponding to the positions testified to by the VE). Accordingly, the Court finds that O.W.'s counter evidence is probative. *See id.*

The Court next evaluates whether O.W.'s counter evidence is significant. In this context, "[s]ignificant evidence 'is a measure of the discrepancy between the VE's estimates (upon which the ALJ relied to render the step-five finding) and the claimant's estimates.'" *Id*. at 1169 (quoting *Wischmann*, 68 F.4th at 505). O.W. notes that his counter evidence indicates that there were 1,133 bench hand packager jobs, 6,952 inspector jobs, and 12,901 sub-assembler jobs in the national economy. Dkt. No. 13 at 28; AR 400-408. The VE testified that there were 32,000, 101,000, and

30,000 jobs, respectively, in these same occupations. *See* AR 82-83.[8] While the disparity in the job numbers identified by the VE and by O.W. is not as pronounced as those in *White* or *Powley*, in total the VE identified job numbers over 100,000, whereas O.W. identified total job numbers across all three occupations of 20,986, which is less than the 25,000 jobs the Ninth Circuit has found "constitutes a significant number," albeit a "close call." *See Gutierrez v. Comm'r Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014). Accordingly, the Court finds O.W.'s counter evidence of job numbers is significant.

As the Commissioner did not address or resolve the discrepancy between the job-numbers evidence offered by the VE and by O.W., this matter must be remanded to ALJ to address the inconsistency in the record evidence. *White*, 44 F.4th at 837 (remanding to allow ALJ to consider competing job-number estimates where the plaintiff had submitted the counter jobs evidence to the Appeals Council).

## IV. DISPOSITION

O.W. argues that a remand for payment of benefits is warranted. "An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017) (citation omitted). The Court may remand for an immediate award of benefits only where (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* at 1045 (citations omitted). Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id.* (citations omitted). That standard is not satisfied here. There are further issues that must be resolved by the

---

[8] The VE testified that she would erode each of these numbers to account for jobs with an alternating sit/stand option. *See* AR 83. As discussed above, the ALJ did not assess any exertional limits in O.W.'s RFC. AR 37.

ALJ in the first instance before a disability determination can be made. The Court finds that remand is appropriate for further proceedings. *See Luther v. Berryhill*, 891 F.3d 872, 877-78 (9th Cir. 2018); 42 U.S.C. § 405(g).

O.W. also requests that upon remand, the case should be assigned to a different ALJ "given the prior ALJ's unsupported adverse credibility finding implicitly rejecting [O.W.]'s testimony." Dkt. No. 13 at 30. ALJs are presumed to be unbiased. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir.2001). While the presumption can be rebutted, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display do not establish bias." *Id*. (citation modified; citation omitted). O.W.'s argument on this point is cursory and falls far short of the required showing. *See id*. (claimant "was required to show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'") (citation omitted).

In remanding this matter for further proceedings, it is not the Court's intent to limit the scope of the remand.

## V. CONCLUSION

For the reasons discussed above, the Court reverses the Commissioner's decision and remands this case for further administrative proceedings consistent with this order. The Clerk of Court shall enter judgment and close this file.

**IT IS SO ORDERED.**

Dated: September 30, 2026



Virginia K. DeMarchi
United States Magistrate Judge